UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARCUS BROOKS, KATHARINE
GUZENSKI, RODRIGO MALDONADO,
CANDIDA ORTIZ, and COURTNEY
WALKER,

                        Petitioners,

            -v.-

WARNERMEDIA DIRECT, LLC,

                        Respondent.

23 Civ. 11030 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

      Petitioners Marcus Brooks, Katharine Guzenski, Rodrigo Maldonado,

Candida Ortiz, and Courtney Walker contend that Respondent WarnerMedia

Direct, LLC ("WarnerMedia") — distributor of the HBO Max (now Max) video-

streaming service — shared their identity and their viewing habits with the

social media company Meta (and possibly others).  According to Petitioners,

this conduct violated the Video Privacy Protection Act (the "VPPA"), 18 U.S.C.

§ 2710, which prohibits "video tape service provider[s]" from "knowingly

disclos[ing], to any person, personally identifiable information concerning any

consumer" without their consent.

      The two petitions now before the Court, however, have little to do with

the parties' underlying dispute.  Instead, in their respective cross-petitions to

compel arbitration, Petitioners seek an order compelling this dispute to

arbitration before the American Arbitration Association (the "AAA"), and

Respondent seeks an order compelling this dispute to arbitration before the

National Arbitration and Mediation (the "NAM").  In other words, both parties are in agreement that this dispute should be arbitrated; they disagree, however, as to the appropriate arbitral forum.  Having reviewed the parties' cross-petitions, the Court finds that there is a disputed issue of fact as to whether the parties agreed to arbitrate before the NAM, and orders limited discovery on this issue.

**BACKGROUND**[1]

### A.    Factual Background

### 1.    The Parties

Respondent WarnerMedia is a media company headquartered in New York City.  (Huber Decl. ¶ 8).  From May 27, 2020, to May 23, 2023, Respondent distributed HBO Max, "a subscription-based video-on-demand streaming platform that offered an array of movies, television series, and

---

[1]    The facts set forth in this Opinion are drawn from the Declarations of Petitioners Marcus Brooks (Dkt. #28 ("Brooks Decl.")), Katharine Guzenski (Dkt. #29 ("Guzenski Decl.")), Rodrigo Maldonado (Dkt. #30 ("Maldonado Decl.")), Candida Ortiz (Dkt. #31 ("Ortiz Decl.")), and Courtney Walker (Dkt. #32 ("Walker Decl.")), filed in connection with their petition to compel arbitration, as well as the Declarations of Patrick Huber (Dkt. #14 ("Huber Decl.")); Su Kelsay (Dkt. #48-1 ("Kelsay Decl.")); and Michael McTigue (Dkt. #48-2 ("McTigue Decl.")).  The Court also relies, as appropriate, on certain of the exhibits attached to these declarations ("[Name] Decl., Ex. [ ]").

For ease of reference, the Court refers to Petitioners' petition to compel arbitration as "Pet. Br." (Dkt. #13); to Respondent's memorandum of law in opposition to Petitioners' petition as "Resp. Opp." (Dkt. #50); and to Petitioners' reply memorandum of law as "Pet. Reply" (Dkt. #69).  The Court refers to Respondent's cross-petition to compel arbitration as "Resp. Br." (Dkt. #48); and to Petitioners' memorandum of law in opposition to Respondent's petition as "Pet. Opp." (Dkt. #67).

Finally, the Court cites the HBO Max Terms of Use dated April 29, 2020, as the "Apr. 2020 TOU" (Dkt. #14-1); the HBO Max Terms of Use dated October 19, 2021, as the "Oct. 2021 TOU" (Dkt. #14-2); the HBO Max Terms of Use dated November 1, 2022 as the "Nov. 2022 TOU" (Dkt. #14-3); the HBO Max Terms of Use dated December 20, 2022, as the "Dec. 2022 TOU" (Dkt. #14-4); and the Max Terms of Use dated May 23, 2023, as the "May 2023 TOU" (Dkt. #14-5).

2

specials." (Kelsay Decl. ¶ 3). On May 23, 2023, HBO Max became Max, an "enhanced streaming platform." (*Id.* ¶ 4).[2] Respondent has distributed Max since May 23, 2023. (*Id.*).

Petitioners Marcus Brooks, Katharine Guzenski, Rodrigo Maldonado, Candida Ortiz, and Courtney Walker are former subscribers to Respondent's video-streaming service HBO Max. (*See* Brooks Decl. ¶ 3; Guzenski Decl. ¶ 3; Maldonado Decl. ¶ 3; Ortiz Decl. ¶ 3; Walker Decl. ¶ 3). Each is a resident of California. (*See* Brooks Decl. ¶ 2; Guzenski Decl. ¶ 2; Maldonado Decl. ¶ 2; Ortiz Decl. ¶ 2; Walker Decl. ¶ 2). The specifics of each Petitioner's interaction with the HBO Max platform are as follows:

- *Brooks*: Brooks created his HBO Max account on October 1, 2021. (Kelsay Decl. ¶ 15). His subscription expired on June 1, 2022. (*Id.*).

- *Guzenski*: Guzenski created her HBO Max account on March 27, 2022. (Kelsay Decl. ¶ 17). Guzenski's subscription expired on May 27, 2022. (*Id.*). On June 22, 2023, Guzenski logged into her (inactive) account on the platform. (*Id.* ¶¶ 21-24).

- *Maldonado*: Maldonado created his HBO Max account on September 18, 2021. (Kelsay Decl. ¶ 25). Maldonado's subscription expired on September 18, 2022. (*Id.*). Additionally, Maldonado logged into his (inactive) account on the platform on December 30, 2022. (*Id.* ¶ 27).

- *Ortiz*: Ortiz created an HBO Max account using the email address ccarolinaortiz@yahoo.com on July 27, 2020. (Kelsay Decl. ¶ 28). That subscription expired on September 12, 2020. (*Id.*). On April 27, 2021, Ortiz

---

[2] For simplicity's sake, and in view of the fact that the streaming service was named HBO Max for most of the time period underlying the events of this case, the Court refers to both the HBO Max and Max streaming platforms as "HBO Max" herein.

created another HBO Max account using the email
address ccarolinaortiz@yahoo.com.  (*Id.* ¶ 30).  Ortiz's
second subscription expired on June 1, 2023.  (*Id.*).

▪ *Walker*:  Walker created her HBO Max account on
April 27, 2022.  (Kelsay Decl. ¶ 31).  Her subscription
expired on September 27, 2022.  (*Id.*).

## 2. The AAA Agreement

Over the course of each Petitioner's relationship with Respondent,

Respondent made a number of updates to its governing terms-of-use

agreement.  Significantly, however, all such agreements contained a mandatory

arbitration provision, which provision required the parties to

> arbitrate all disputes and claims between [themselves],
> except for claims arising from bodily injury or that
> pertain to enforcing, protecting or the validity of [their]
> intellectual property rights (or the intellectual property
> rights of any of [their] licensors, affiliates and partners).

(*See* Apr. 2020 TOU at 34; Oct. 2021 TOU at 44; Nov. 2022 TOU at 32-33;

Dec. 2022 TOU at 32; May 2023 TOU at 27).

The first three agreements in this sequence — the HBO Max Terms of

Use dated April 29, 2020 (the "April 2020 Terms"); the HBO Max Terms of Use

dated October 19, 2021 (the "October 2021 Terms"); and the HBO Max Terms

of Use dated November 1, 2022 (the "November 2022 Terms" and, together with

the April 2020 Terms and the October 2021 Terms, the "AAA Agreement") —

recited that "[t]he arbitration will be governed by the Consumer Arbitration

Rules ('AAA Rules') of the [AAA] … and will be administered by the AAA."  (*See*

Apr. 2020 TOU at 36; Oct. 2021 TOU at 47; Nov. 2022 TOU at 35).  All

Petitioners acknowledge that they assented to arbitrating their disputes with

Respondent before the AAA pursuant to one of these three agreements when they created an account on HBO Max.  (*See* Brooks Decl. ¶ 5; Guzenski Decl. ¶ 5; Maldonado Decl. ¶ 5; Ortiz Decl. ¶ 5; Walker Decl. ¶ 5).

### 3.    The Transition to the NAM Agreement

On December 20, 2022, Respondent updated its then-governing terms of use, the November 2022 Terms.  (Kelsay Decl. ¶ 10).  Under the new agreement (the "December 2022 Terms"), the NAM — not the AAA — was designated as the arbitral forum for consumer disputes.  (Dec. 2022 TOU at 36).  Specifically, the December 2022 Terms dictated that arbitrations between Respondent and its consumers were to be "governed by applicable rules of the [NAM] (including the Comprehensive Dispute Resolution Rules and Procedures and/or the Supplemental Rules for Mass Arbitration Filings, as applicable) ('NAM Rules') … and [] administered by the NAM."  (*Id.*).

Starting on the same day, December 20, 2022, Respondent sent an email to the email addresses of all current and former subscribers to HBO Max in an effort to notify them about the change (the "NAM Email").  (Kelsay Decl. ¶ 11). The subject line of the NAM Email was "HBO Max has updated Terms of Use," and the body of the email stated the following:

> Updated Terms of Use
>
> HBO Max has updated our Terms of Use ("Terms").  The updates contain important information about your legal rights, including updates to the arbitration clause and other rules and procedures that govern the resolution of disputes between you and HBO Max.  The updates won't affect the way you use HBO Max.

These updated terms will apply as of today for new subscribers. For prior and existing subscribers, like you, the terms apply beginning on the date your subscription renews or 30 days from today, whichever comes first. You can review the new updated Terms here.

Your continued subscription to and/or access of HBO Max will confirm that you have reviewed and agreed to the updated Terms of Use.

Thank you for being part of HBO Max!

(*Id.*). Additionally, the NAM Email contained two hyperlinks, shown in purple and underlined text, that navigated viewers to a webpage on the HBO Max website setting forth the full text of the December 2022 Terms. (*Id.*).



A copy of the NAM Email. (Kelsay Decl. ¶ 12).

Also starting on December 20, 2022, HBO Max distributed an in-app pop-up notification regarding the December 2022 Terms, which notification appeared when a customer first accessed the HBO Max platform on or after

that date (the "NAM Pop-Up").  (Kelsay Decl. ¶ 13).  The NAM Pop-Up

notification stated the following:

> We've updated our Terms of Use.
>
> These updates contain important information about your legal rights, including an updated arbitration clause.  By continuing to subscribe to and/or access HBO Max, you agree to be bound by the updated Terms. Read the updated Terms at www.hbomax.com/terms-of-use/en-us.

(*Id.*).  Subscribers were not able to access the HBO Max platform to stream

content until exiting out of the NAM Pop-Up.  (*Id.*).



A copy of the NAM Pop-Up.  (Kelsay Decl. ¶ 13).

Thereafter, on May 23, 2023, when HBO Max became Max, customers

who tried to access HBO Max were redirected to the new Max platform.  (Kelsay

Decl. ¶ 22).  Customers were required to enter their account credentials to log

into Max and, after logging in, were presented with a stand-alone screen that

contained a hyperlink to the new Max terms of use.  (*Id.* ¶¶ 22-23).  Like the

December 2022 Terms, under the new Max terms of use, dated May 23, 2023

(the "May 2023 Terms" and together with the December 2022 Terms, the "NAM

Agreement"), the NAM was designated as the arbitral forum for consumer

disputes.  (May 2023 TOU at 29-30).  The standalone screen indicated that "[b]y selecting 'Start Streaming' you agree to the [May 2023 Terms] and acknowledge you have read the Privacy Policy."  (Kelsay Decl. ¶ 23).  To access the Max platform, customers had to select "Start Streaming."  (*Id.*).

### 4. Petitioners Attempt to Reject the December 2022 Terms and Initiate the Arbitration Process

In January 2023, Petitioners' counsel sent letters to Respondent on behalf of each Petitioner purporting to reject the December 2022 Terms. (McTigue Decl. ¶ 12; *see also id.*, Ex. 10 (Brooks), 11 (Guzenski), 12 (Maldonado), 13 (Ortiz), 14 (Walker)).  At that time, only Petitioner Guzenski remained subscribed to HBO Max.  (Kelsay Decl. ¶¶ 15-30).  Importantly, Respondent claims — and Petitioners do not dispute — that each Petitioner used the HBO Max website after they received notice of the December 2022 Terms to, at a minimum, review the December 2022 Terms; after all, without reviewing the terms, Petitioners could not have rejected the proposed changes to the AAA Agreement.  (*See* Pet. Opp. 11-12).

Also in January 2023, Petitioners' counsel served Respondent with Notices of Dispute ("NOD") on behalf of each Petitioner.  (Huber Decl. ¶¶ 7-9). Under the AAA Agreement, consumers were required to serve Respondent with a NOD to initiate the arbitration process.  (*See* Apr. 2020 TOU at 35; Oct. 2021 TOU at 46; Nov. 2022 TOU at 34).  Pursuant to the NODs, which are substantially identical, each Petitioner claimed that:

> I recently learned [Respondent] may have shared the videos I watched and my identity with Meta and possibly other third parties.  [Respondent] disclosed my personal

> information using software called the Meta Pixel and it
> may have also used other, similar software.
>
> When [Respondent] sent third parties my specific video
> watching history, it violated the [VPPA], 18 U.S.C.
> § 2710.   The VPPA prohibits [Respondent] from
> knowingly disclosing to any person, without informed
> written consent, information which identifies an
> individual user as having requested or obtained specific
> video materials.

(*See* McTigue Decl., Ex. 1 (Guzenski NOD), 2 (Ortiz NOD)).

On July 18, 2023, Petitioners, along with more than a thousand other individuals represented by Petitioners' counsel, each filed an individual arbitration demand against Respondent with the AAA.  (Huber Decl. ¶ 10; *id.*, Ex. P at 2, Ex. R at 2).  Respondent's counsel thereafter sent a letter to Petitioners' counsel asserting that Respondent "has designated [the NAM] to administer consumer arbitrations," and that Respondent's arbitration agreement "is not, and will not be, registered with the AAA," a prerequisite to the AAA's acceptance of Petitioners' arbitration demands.  (*Id.*, Ex. P at 2).  On August 11, 2023, the AAA sent a letter to both Petitioners and Respondent's counsel declining to administer the 1,030 individual consumer demands for arbitration filed against Respondent.  (*Id.*, Ex. R at 2).  Specifically, the AAA indicated that:

> [p]rior to the filing of these arbitrations, [Respondent]
> specifically requested that their arbitration clause be
> removed from the AAA's Consumer Clause Registry.
> The AAA complied with their request.  Per their request,
> [Respondent]  failed to comply with the AAA's policies
> regarding consumer claims ....
>
> Due to [Respondent]'s prior non-compliance, in order
> for the AAA to consider accepting these consumer

> disputes … [Respondent] would need to advise the AAA
> of its intention to comply with the AAA's Consumer
> Rules and Protocol and register its arbitration clause
> naming the AAA[.]

(*Id.*).

## B.    Procedural Background

On September 12, 2023, Petitioners filed a petition to compel arbitration before the AAA in the Central District of California. (Dkt. #1). Shortly thereafter, Petitioners filed a memorandum of points and authorities in support of that petition. (Dkt. #13). On November 6, 2023, Respondent filed a motion to transfer the case to the Southern District of New York on account of the New-York-based forum-selection clauses in both the AAA and NAM Agreements. (*See generally* Dkt. #41). Ten days later, on November 16, 2023, Respondent filed a cross-petition to compel arbitration before the NAM (Dkt. #47-48), and Petitioners filed their opposition to Respondent's motion to transfer (Dkt. #46).

On November 20, 2023, Respondent filed its opposition to Petitioners' petition to compel arbitration (Dkt. #50), as well as a reply in further support of its own motion to transfer (Dkt. #49). Petitioners' opposition to Respondent's cross-petition was due on December 4, 2023, but before that date, the parties stipulated to adjourning all pending briefing deadlines on the parties' cross-petitions in anticipation of the transfer of the case to this Court. (Dkt. #56). On December 4, 2023, the Central District of California granted Respondent's motion to transfer (Dkt. #57), and on December 20, 2023, the case was formally transferred to this District (Dkt. #58).

Subsequently, on December 27, 2023, this Court directed the parties to file a joint letter proposing a schedule for the remainder of the briefing on Petitioners' petition to compel arbitration and Respondent's cross-petition. (Dkt. #59). The parties filed the letter on January 5, 2024, and the Court promptly endorsed it. (Dkt. #63-64). In accordance with the parties' proposed schedule, on January 19, 2024, Petitioners filed their opposition to Respondent's cross-motion to compel arbitration (Dkt. #67), as well as their reply in further support of their own petition to compel arbitration (Dkt. #69). On February 9, 2024, Respondent filed its reply in further support of its cross-motion to compel arbitration, concluding the briefing in this action. (Dkt. #70).

## DISCUSSION

### A.    Applicable Law

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted). Section 2 of the FAA provides that "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA allows a party to such an agreement to petition a district court for an order compelling arbitration where a counterparty "fail[s], neglect[s], or refus[es] ... to arbitrate" under the terms of

an arbitration agreement.  *Id.* § 4.  A court ruling on a motion to compel arbitration must decide two issues: "[i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue."  *Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015); *accord Daly* v. *Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019).

In resolving a motion to compel arbitration, the court applies "a standard similar to that applicable for a motion for summary judgment."  *Meyer*, 868 F.3d at 74 (internal quotations omitted).  "[T]he court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Id.* (alterations adopted) (internal quotation marks and citations omitted).  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."  *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citing 9 U.S.C. § 4).  However, the moving party need not "show initially that the agreement would be enforceable, merely that one existed."  *Hines* v. *Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order).  Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid."  *Harrington* v. *Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala.* v. *Randolph*, 531 U.S. 79, 91-92 (2000)).

**B.    Analysis**

    **1.    The Court Has the Authority to Compel Arbitration in Accordance with the AAA's Rules**

As preliminary matter, the Court addresses Respondent's position that the Court lacks authority to grant Petitioners' requested relief, specifically, to "compel Respondent to 'register[] its arbitration agreement with [the] AAA and pay[] necessary fees.'" (Resp. Opp. 13 (quoting Dkt. #1 ¶ 34)).

As the Court previously noted, Section 4 of the FAA empowers "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to "petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. Furthermore, the FAA indicates that the court, "upon being satisfied that the making of the agreement for arbitration ... is not in issue," "*shall* make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* (emphasis added); *see also Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion ... mandat[ing] that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). While the "gateway" question of whether the parties are bound by a valid arbitration agreement is for the court to decide, "procedural questions which grow out of the dispute and bear on its final disposition are presumptively ... for [the] arbitrator[] to decide." *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (internal quotation marks omitted).

13

Importantly, each iteration of the AAA Agreement incorporates the AAA's rules.  (*See* Apr. 2020 TOU at 36 ("The arbitration will be governed by the Consumer Arbitration Rules [] of the [AAA] [], as modified by this arbitration provision, and will be administered by the AAA."); Oct. 2021 TOU at 47 (same); Nov. 2022 TOU at 35 (same)).  *See also Varley* v. *Tarrytown Assocs., Inc.*, 477 F.2d 208, 210 (2d Cir. 1973) (holding that clause providing for settlement of controversies "by arbitration pursuant to the rules of the [AAA] … is sufficient to incorporate the rules into the agreement"); *accord Idea Nuova, Inc.* v. *GM Licensing Grp., Inc.*, 617 F.3d 177 (2d Cir. 2010).  It follows logically, then, that the Court may enter an order compelling the parties to proceed to arbitration in accordance with the AAA's rules.  *Cf. Edmondson* v. *Lilliston Ford Inc*, 722 F. App'x 251, 254-55 (3d Cir. 2018) (summary order) (holding that district court had "properly directed the parties to proceed to arbitration in accordance with the terms of the[ir] agreement," even though company had not registered agreement with AAA or paid requisite fees (alterations adopted)).

Respondent cites the recent decision of the Seventh Circuit in *Wallrich* v. *Samsung Elecs. Am., Inc.*, — F.4th —, No. 23 Civ. 2842 (TLK), 2024 WL 3249646 (7th Cir. July 1, 2024), to support its position that the Court may not order it to pay the AAA's registration fees.  (*See generally* Dkt. #79).  By way of background, in *Wallrich*, the plaintiff filed an arbitration claim before the AAA alleging that the defendants, two Samsung entities, had unlawfully collected and stored sensitive biometric data through their electronic devices in violation of Illinois law.  *Id.* at *1.  After the defendants "refused to pay the

administrative filing fees required by the AAA," the AAA, in its discretion and in accordance with its rules, "offered the consumers the opportunity to advance [the defendants'] fees so that the arbitration could proceed, but [the consumers] declined." *Id.* at *2.  The AAA then closed the arbitration, and the plaintiff sued in federal court, seeking an order compelling the defendants to arbitrate before the AAA and pay their share of the filing fees. *Id.*  The district court found that an enforceable arbitration agreement existed between the parties and ordered the defendants to proceed to arbitration before the AAA and pay their share of the filing fees. *Id.*

The Seventh Circuit reversed, finding that the plaintiff did not meet her burden to show that an arbitration agreement existed between her and the defendants. *Wallrich*, 2024 WL 3249646, at *6.  The Seventh Circuit went on to state that, "[e]ven if the consumers had met their evidentiary burden, the district court exceeded its authority and the scope of the arbitration agreement by ordering [defendants] to pay the AAA filing fees." *Id.*, at *7.  It held that the fee dispute that had scuttled the arbitration was a "procedural issue" and that "[t]he arbitration agreement allegedly entered into between [defendants] and the consumers delegated threshold arbitration fee disputes to the AAA." *Id.*

Even if *Wallrich* were controlling authority, however, its reasoning does not apply here.  In *Wallrich*, the AAA, "in line with its rules (which it applies in its discretion), allowed the consumers to advance [the defendants'] fees," and when the consumers chose not to do so, the AAA "terminated the proceedings, opening the door for the consumers to pursue their claims in district court."

15

Accordingly, in that case, the district court's order requiring the defendants to pay their share of the AAA filing fees represented an end-run around how the AAA had chosen to apply its own rules in administering the parties' dispute.

Here, the AAA made it clear that it "remains available to administer the parties' arbitrations upon [Respondent]'s compliance with [the AAA's] request to register its arbitration clause or per a court order compelling these matters to arbitration administered by the AAA[.]"  (Huber Decl., Ex. R at 3). Accordingly, an order compelling the parties to proceed to arbitration in accordance with the AAA's rules would not circumvent the AAA's interpretation and application of its own rules in its administration of the instant dispute. Moreover, the Court need not "compel Respondent to 'register[] its arbitration agreement with [the] AAA and pay[] necessary fees,'" (Resp. Opp. 13 (quoting Dkt. #1 ¶ 34)), as (unlike *Wallrich*) the AAA has not excused Respondent's failure to pay those fees or asked Petitioners to advance the fees on Respondent's behalf.  This Court need only compel the parties to proceed to arbitration in accordance with the AAA's rules; if, thereafter, the AAA requires Respondent to pay certain fees or otherwise, this Court's order would incorporate the AAA's direction.

Alternatively, Respondent argues that, even if the AAA Agreement governed, the Court is unable to compel arbitration with the AAA because the AAA has closed Petitioners' cases pursuant to its own rules and is therefore "unavailable" as an arbitral forum.  (*See* Resp. Br. 18-19).  For this reason, in Respondent's view, the Court should compel the parties to arbitrate before the

NAM.  In making this argument, Respondent cites a number of cases in which courts have compelled parties whose chosen arbitral forum was "unavailable" to arbitrate in an alternative forum.  *See, e.g.*, *Crewe* v. *Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 76 (S.D.N.Y. 2012) (compelling arbitration in alternative forum and noting that "the parties' agreement reflects a broader intention to arbitrate even if the designated forum or fora prove unavailable"); *see also Byrd* v. *SunTrust Bank*, No. 12 Civ. 2314 (JPM), 2013 WL 3816714, at *12 (W.D. Tenn. July 22, 2013) (compelling arbitration in alternative forum where designated forum was unavailable); *Clerk* v. *Cash Cent. of Utah LLC*, No. 09 Civ. 4964, 2011 WL 3739549, at *6 (E.D. Pa. Aug. 25, 2011) (same); *In re Gateway LX6810 Comp. Prods. Litig.*, No. 10 Civ. 1563 (JST) (JEM), 2011 WL 3099862, at *2 (C.D. Cal. July 21, 2011) (same).

These cases, however, are readily distinguishable from the one at hand. For instance, as Petitioners correctly identify (*see* Pet. Opp. 20), *Crewe*, *Clerk*, and *In re Gateway* each concerned agreements to arbitrate in front of the National Arbitration Forum ("NAF"), an arbitral forum that had ceased to administer consumer arbitrations by the time each case appeared before its respective court.  *See Crewe*, 884 F. Supp. 2d at 76 ("NAF has ceased arbitrating consumer disputes, pursuant to a consent judgment with the Attorney General of Minnesota."); *Clerk*, 2011 WL 3739549, at *2 ("NAF ceased administering arbitrations between consumers and businesses in July, 2009[.]"); *In re Gateway*, 2011 WL 3099862, at *2 ("NAF no longer arbitrates consumer fraud claims[.]").  *Byrd*, too, is distinguishable, on the grounds that

17

all of the parties to that case were in agreement that the designated arbitral fora were unavailable.  *See Byrd*, 2013 WL 3816714, at *5.

Here, Petitioners dispute Respondent's assertion that the AAA is "unavailable" to arbitrate their disputes.  (*See* Pet. Opp. 19-20).  Rightfully so: Petitioners are correct that the AAA remains available to arbitrate the parties' dispute.  Indeed, as the Court has already discussed, in its August 2023 letter to the parties declining to administer the consumer demands for arbitration filed against Respondent, the AAA explicitly stated that it "remains available to administer the parties' arbitrations upon [Respondent]'s compliance with our request to register its arbitration clause or per a court order compelling these matters to arbitration administered by the AAA[.]"  (Huber Decl., Ex. R at 3).  Accordingly, the Court finds that it has the authority to compel arbitration to the AAA in this instance.

### 2. The Court Will Authorize Discovery on the Issue of Assent to the NAM Agreement

As previously noted, a court ruling on a motion to compel arbitration must decide two issues: "[i] whether the parties agreed to arbitrate, and, if so, [ii] whether the scope of that agreement encompasses the claims at issue." *Holick*, 802 F.3d at 394.  The Court's analysis thus begins with an assessment of whether the parties agreed to arbitrate.  To review, all Petitioners acknowledge that they assented to arbitrating their disputes with Respondent before the AAA pursuant to the AAA Agreement when they created an account on HBO Max.  (*See* Brooks Decl. ¶ 5; Guzenski Decl. ¶ 5; Maldonado Decl. ¶ 5; Ortiz Decl. ¶ 5; Walker Decl. ¶ 5).  Accordingly, the Court need only determine

whether the parties' agreement to arbitrate before the AAA was later supplanted by a subsequent agreement to arbitrate before the NAM. Ultimately, the Court finds that more evidence is needed to determine whether Petitioners assented to the NAM Agreement and orders discovery to that effect.

### a.    California Law Applies to Contract Formation Issues

The Court begins with the antecedent issue of which law applies to the issues before it.  Section 2 of the FAA provides that a written arbitration provision in a commercial contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Accordingly, state law — "whether of legislative or judicial origin" — governs issues "concerning the validity, revocability, and enforceability" of agreements to arbitrate.  *Chelsea Square Textiles, Inc.* v. *Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 295-96 (2d Cir. 1999) ("[W]hile … the FAA preempts state law that treats arbitration agreements differently from any other contracts, it also preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." (internal quotation marks omitted)); *see also Bell* v. *Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract … the ultimate question of whether the parties agreed to arbitrate is determined by state law.").

Each of the relevant Terms of Use contains a New York choice-of-law clause.[3]  But the New York choice-of-law clause

> does not d[ictate] [what] law [] the Court should apply to determine [the validity of an] arbitration clause [that] was part of an[] agreement between the parties unless and until it is determined that the parties have agreed to and are bound by it.

*Schnabel* v. *Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012).  That is, "[a]pplying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."  *Id.*  Accordingly, the Court must conduct a formal choice-of-law analysis to determine which state's law applies.

In this regard, the Court observes that the parties generally apply California law in their submissions as to issues of contract formation.  (*See, e.g.*, Pet. Br. 15; Resp. Br. 14).  This fact alone supports application of California law.  *See Krumme* v. *Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alterations omitted)).

---

[3]  *See* Apr. 2020 TOU at 40 ("These Terms shall be governed by, construed, and enforced in accordance with the laws of the State of New York, as they are applied to agreements entered into and to be performed entirely within New York and without regard to conflict of law principles, except to the extent that law is inconsistent with or preempted by federal law.); Oct. 2021 TOU at 56 ("These Terms shall be governed by the laws of the State of New York, without regard to conflict of law principles."); Nov. 2022 TOU at 44 ("These Terms shall be governed by the laws of the State of New York, without regard to conflict of law principles."); Dec. 2022 TOU at 51 ("These Terms shall be governed by the laws of the State of New York, without regard to conflict of law principles."); May 2023 TOU at 39 ("This Agreement shall be governed by the laws of the State of New York, without regard to conflict of law principles.").

Nonetheless, because the parties do not exclusively apply California law, the Court conducts a full choice-of-law analysis herein.  The Court employs New York's "interest analysis" for deciding which state's law applies in these circumstances, *Meyer* v. *Kalanick* ("*Meyer I*"), 200 F. Supp. 3d 408, 413 (S.D.N.Y. 2016), *vacated on other grounds sub nom. Meyer* v. *Uber Techs., Inc.* ("*Meyer II*"), 868 F.3d 66 (2d Cir. 2017), and accordingly considers five factors:

> [i] the place of contracting; [ii] the place of the contract negotiations; [iii] the place of the performance of the contract; [iv] the location of the subject matter of the contract; and [v] the domicile, residence, nationality, places of incorporation, and places of business of the parties.

*Philips Credit Corp.* v. *Regent Health Grp., Inc.*, 953 F. Supp. 482, 502 (S.D.N.Y. 1997).

Here, the interest analysis supports application of California law.  While Respondent is a resident of New York (*see* Huber Decl. ¶ 8), Petitioners are all residents of California (*see* Pet. Br. 3).  The record before the Court indicates that Petitioners signed up for their HBO Max accounts in and utilized HBO Max's streaming services from California, as affirmed by the facts that the billing addresses that Petitioners have on file with Respondent reflect California addresses (Dkt. #46 at 6-7), and that Petitioners sent their respective NODs to Respondent from their California addresses (*see, e.g.*, McTigue Decl., Ex. 1 (Guzenski NOD), 2 (Ortiz NOD)).  Accordingly, the performance of the contract and the impact of any injury incurred therefrom occurred in California.

Considering both the parties' utilization of California law in their submissions and its own interest analysis, the Court finds that it is appropriate to apply California law to issues of contract formation in this case. The Court notes that, notwithstanding this choice, "New York and California apply 'substantially similar rules'" for contract acceptance. *See Meyer II*, 868 F.3d at 74 (quoting *Schnabel*, 697 F.3d at 119). Moreover, the Court "does not view the choice between California law and New York law as dispositive with respect to the issue of whether an arbitration agreement was formed." *Meyer I*, 200 F. Supp. 3d at 412-13.

### b. The Record Lacks Sufficient Evidence to Establish Petitioners' Assent to the NAM Agreement

"The threshold question facing any court considering a motion to compel arbitration is whether the parties have indeed agreed to arbitrate." *Doctor's Assocs., Inc.* v. *Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotations and alterations omitted). Under California law, the formation of a contract requires "the parties [to] manifest their mutual assent to the terms of the agreement." *Berman* v. *Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Importantly, however, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Knutson* v. *Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014) (quoting *Windsor Mills, Inc.* v. *Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Cal. Ct. App. 1972)). "This principle of knowing

consent applies with particular force to provisions for arbitration." *Id.* (quoting *Windsor Mills*, 25 Cal. App. 3d at 993).

In the context of contracts that are formed online — such as the various iterations of HBO Max's terms of use that are at issue in this case — these contract formation principles "apply with equal force." *Berman*, 30 F.4th at 855-56.  Because it is difficult to demonstrate "knowing consent" to an agreement formed online, *Knutson*, 771 F.3d at 566, however, courts often permit website operators to demonstrate consent on the basis of an "inquiry notice" theory, *Berman*, 30 F.4th at 855-56.

These courts apply a two-part test to determine whether a consumer assented to a web-based contract via inquiry notice, examining whether:

> [i] the website provide[d] reasonably conspicuous notice of the terms to which the consumer w[ould] be bound; and [ii] the consumer t[ook] some action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her assent to those terms.

*Id.*  The first of these two steps, *i.e.*, determining whether a website provided "reasonably conspicuous" notice of its terms of use to consumers, is a fact-specific inquiry.  To be "reasonably conspicuous," notice of the terms of use "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it," and any hyperlink to those terms "must be readily apparent."  *Berman*, 40 F.4th at 856-57.  Ultimately, "the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's

general design all contribute to whether a reasonably prudent user would have inquiry notice[.]" *Nguyen* v. *Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (citing *In re Zappos.com, Inc. Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) ("The Terms of Use is inconspicuous, buried in the middle to bottom of every Zappos.com webpage among many other links, and the website never directs a user to the Terms of Use.")).

The second step requires an assessment of whether a consumer has "take[n] some action … that unambiguously manifests his or her assent to th[e] terms." *Berman*, 40 F.4th at 856. Generally, this takes one of two forms: either a website "presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed" — commonly referred to as a "clickwrap" agreement — or the website "offers terms that are disclosed only through a hyperlink," and a user's decision to continue using the site "supposedly manifests assent to those terms" — commonly referred to as a "browsewrap" agreement. *Id.*

Relevant to the instant dispute, a contract may be formed where users receive sufficient inquiry notice of a website's terms of use via email and thereafter continue to use the site. *See, e.g.*, *Sadlock* v. *Walt Disney Co.*, No. 22 Civ. 9155 (EMC), 2023 WL 4869245 at *12-13 (N.D. Cal. July 31, 2023) (finding plaintiff's uncontested receipt of email regarding updates to arbitration agreement was sufficient notice such that continued use of defendant's site was unambiguous assent to new terms); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (noting that plaintiffs "were

provided notice that the terms of the user agreement were changing through an email from Facebook" and that "in combination with [their] … continued use[,] [this] [wa]s enough for notice and assent"); *West* v. *Uber Techs.*, No. 18 Civ. 3001 (PSG) (GJS), 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (noting that "[c]ourts have found that when consumers receive emails" such as the one at issue — which had a subject line stating that Uber had updated its terms of use, informed users that Uber's arbitration agreement had been revised, and provided a link to the updated terms — "continued use of the service or product constitutes assent to the updated terms").

Turning to the facts of this case, Respondent attempts to demonstrate that Petitioners unambiguously assented to the December 2022 Terms (and as such, the NAM Agreement) on an inquiry notice theory.  As to the first prong of the inquiry notice test, Petitioner do not dispute that they received reasonably conspicuous notice of HBO Max's updated terms of use in the form of the NAM Email.  (Pet. Opp. 10).  Instead of arguing that this notice was inadequate, Petitioners dispute Respondent's showing on the second prong, contending that Petitioners did not "unambiguously manifest [their] assent" to the December 2022 Terms.  (*Id.* at 10-11).  *Berman*, 40 F.4th at 856.

For its part, Respondent sets forth multiple theories as to how Petitioners demonstrated "unambiguous assent" to the December 2022 Terms.  The Court addresses each theory in turn, ultimately concluding that it does not have enough evidence to determine whether Petitioners unambiguously assented to these terms.

25

### i.        Assent Through Use

Respondent's first theory of "unambiguous assent" is that Petitioners assented to the December 2022 Terms when they navigated from the NAM Email to the HBO Max platform to actually view the December 2022 Terms, on the theory that continued use of a website after receiving notice of changes to that site's terms constitutes unambiguous assent.  The Court is unpersuaded. Importantly, the NAM Email (i) directed consumers to view the text of the December 2022 Terms by clicking on a hyperlink that took them to a webpage on the HBO Max website and indicated that (ii) "the new terms apply beginning on the date your subscription renews or 30 days from today, whichever comes first."  (Pet. Br. 8 (alterations adopted)).  To find that Petitioners assented to the December 2022 Terms by clicking the hyperlink in the NAM Email, then, would be to find that Petitioners assented to the December 2022 Terms before they were even able to read them (and long before the terms purportedly came into effect).  Such a finding would inappropriately validate a "contract [that was] foisted upon [consumers] simply by passively viewing a website."  *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (requiring plaintiff to have, at a minimum, clicked "Sign Up" button on website for purposes of establishing assent) ("[A] user ... had to take *some* action ... from which assent might be inferred." (emphasis added)).

Accordingly, the Court finds that accessing the site to view the December 2022 Terms did not constitute unambiguous assent to those terms.  That is, Petitioners had to do more than just click the hyperlink in the NAM Email to

manifest assent to the terms. *Cf. West*, 2018 WL 5848903, at *5 (finding plaintiff bound by updates to arbitration agreement of which he received notice in November 2016 because he used defendant's app to secure ridesharing services as late as December 2017); *In re Uber Techs., Inc.*, No. 18 MD 2826 (PSG) (GJS), 2019 WL 6317770, at *2-4 (C.D. Cal. Aug. 19, 2019) (finding plaintiff bound by updates to arbitration agreement where email notice "expressly stated … that continued use of the Uber App would serve as consent to the updated terms," and plaintiff "completed over a thousand trips after the email notice").

The cases proffered by Respondent on this point are inapposite. For instance, in *Sadlock* v. *Walt Disney Co.*, the court found that "emails followed by continued use is sufficient to establish assent." 2023 WL 4869245, at *12. In that case, however, the plaintiff-petitioner's use was continuous and occurred *after* the proposed terms had gone into effect. *Id.* at *1-12 (finding consumer assented to changes in arbitration agreement where an "email explained [] that 'these terms will be effective beginning on November 3, 2022[,]'" and "[o]n or about November 12, 2022, [plaintiff] visited and browsed [defendant's website] on his computer" and "continued to use the service" thereafter). Likewise, in *Dlugolecki* v. *PeopleConnect, Inc.*, the court found that the plaintiff-petitioner had assented to proposed changes to an arbitration agreement where "the preponderance of the evidence … indicate[d]" that he had used the website after changes to its terms of service came into effect. No. 20 Civ. 3657 (GW) (GJS), 2020 WL 13587803, at *2 (C.D. Cal. Nov. 9, 2020)

27

(finding plaintiff assented to updated arbitration agreement that went into effect in 2017 because plaintiff "acknowledge[d] that he 'may have' visited [defendant's] [w]ebsite 'between 2018 and thereafter'").  These cases support only the more limited proposition that continued use of a website after receiving notice of proposed changes to the website's terms of use *and* after those changes have come into effect constitutes unambiguous acceptance.

Here, by contrast, the December 2022 Terms purportedly came into effect "beginning on the date your subscription renews or 30 days from [receipt of the NAM Email], whichever comes first."  (Kelsay Decl. ¶ 11).  Petitioners' "use" of the HBO Max website to view the December 2022 Terms immediately after receiving the NAM Email thus occurred before those terms had come into effect.[4]  Therefore, the Court finds that no Petitioner can be bound by the December 2022 Terms solely as a result of having used the site to view the terms.  For at least Petitioners Brooks, Maldonado, and Walker, this act is the only one that could, based on the facts currently before the Court, constitute

---

[4]      Respondent argues, without success, that the NAM Agreement went into effect as soon as it was posted on the HBO Max platform on December 20, 2022, because the AAA Agreement purported to permit Respondent to give effect to any modifications of the websites' terms of use simply by posting the modified terms online.  (Resp. Br. 4-5).  As a preliminary matter, the NAM Email explicitly noted that the December 2022 Terms went into effect "beginning on the date [one's] subscription renew[ed] or 30 days from [receipt of the NAM Email], whichever c[ame] first."  (Kelsay Decl. ¶ 11).  Furthermore, the case that Respondent cites in support of its proposition, *Dlugolecki* v. *PeopleConnect, Inc.*, does not aid its cause.  In that case, while the court "enforce[d] updated terms where plaintiff agreed that the [terms] could be revised from time to time, and that such revisions were effective immediately at the time of posting" (Resp. Br. 14-15 (internal quotation marks and citations omitted)), customers were explicitly told in the applicable notice of the change that the new terms were effective immediately.  No. 20 Civ. 3657 (GW) (GJS), 2020 WL 13587803, at *2 (C.D. Cal. Nov. 9, 2020).

their assent.[5]  For this reason, the Court finds that Respondent has not demonstrated that those Petitioners are bound by the December 2022 Terms.

The Court's analysis does not end there, however.  Respondent claims that Petitioners Brooks, Maldonado, and Walker could have manifested their assent to the December 2022 Terms via "use" other than just clicking the hyperlink in the NAM Email to view the December 2022 Terms.  Specifically, Respondent claims that these Petitioners could have agreed to the December 2022 Terms by using the HBO Max platform as "authorized users" on another person's account after the December 2022 Terms came into effect. Importantly, while there is no evidence that Brooks, Maldonado, and Walker used their own HBO Max accounts after receiving the NAM Email other than to view the December 2022 Terms, there is also no evidence proving that those Petitioners did not use the HBO Max platform as "authorized users" on *someone else's* account after the December 2022 Terms came into effect.[6]

The Court finds that use of the HBO Max platform by Petitioners Brooks, Maldonado, and Walker as "authorized users" on accounts other than their own after the December 2022 Terms came into effect could plausibly constitute acceptance of those terms.  *See Doherty* v. *Barclays Bank Delaware*, No. 16 Civ.

---

[5]     That Petitioner Maldonado logged onto the HBO Max platform on December 30, 2022, does not alter this finding; the December 2022 Terms had not yet gone into effect on this date.  (*See* Kelsay Decl. ¶ 11 (indicating that the December 2022 Terms go into effect "beginning on the date your subscription renews or 30 days from [receipt of the NAM Email], whichever comes first")).

[6]     Respondent is unable to determine whether Petitioners used the HBO Max platform as "authorized users" on other users' accounts via its own records, and as such requests discovery on the issue.  (Kelsay Decl. ¶ 8).

1131 (AJB) (NLS), 2017 WL 588446, at *3 (S.D. Cal. Feb. 14, 2017) (finding plaintiff, if proven to be "authorized user" on father's credit card account, capable of consenting to arbitration provision in terms of service governing that account); *see also Mey* v. *DIRECTV, LLC*, 971 F.3d 284, 287-88 (4th Cir. 2020) (finding plaintiff assented to arbitration agreement where arbitration provision covered "'all authorized [] users or beneficiaries of services ... under th[e] [a]greement[,]'" even though plaintiff's account "was in her husband's name and she was merely an authorized user").  (*See* Dec. 2022 TOU at 33 ("References to 'HBO Max,' 'you,' 'we' and 'us' in [the NAM Agreement] include our respective predecessors in interest, successors and assigns, as well as ... all authorized or unauthorized users or beneficiaries of the [p]latform under this or prior [a]greements between us.")).  But the Court has no evidence either demonstrating such use or eliminating the possibility of such use, and as such, declines to make a final determination on the issue.  Accordingly, the Court authorizes Respondent to seek discovery pursuant to Federal Rule of Civil Procedure 26 on the issue of whether Brooks, Maldonado, and Walker used Respondent's platform as an "authorized user" any time after the December 2022 Terms were posted.  *See also Moton* v. *Maplebear Inc.*, No. 15 Civ. 8879 (CM), 2016 WL 616343, at *4 (S.D.N.Y. Feb. 9, 2016) ("Courts have permitted limited discovery into the validity of [an] arbitration agreement[.]").

### ii. Assent Through Maintenance of Subscription

Respondent's second theory of unambiguous assent pertains to a single Petitioner, Candida Ortiz.  According to Respondent, Ortiz assented to the

December 2022 Terms by remaining subscribed to HBO Max's streaming service after those terms had gone into effect.  (Kelsay Decl. ¶ 30).  As a reminder, Ortiz's subscription to the HBO Max streaming service ended on June 1, 2023, six months after the December 2022 Terms were debuted.  (*Id.*).

Petitioners argue that maintaining an account without logging into it does not constitute unambiguous assent to the new contract terms.  (Pet. Opp. 13-14).  However, as Respondent rightly identifies, the cases Petitioners cite in support of their position are readily distinguishable from the one at hand.  In *Knutson* v. *Sirius XM Radio Inc.*, for instance, the court found that a consumer's maintenance of his free trial subscription to Sirius XM's satellite radio service after he received notice of alterations to the underlying arbitration agreement did not constitute "unambiguous assent" to that agreement.  771 F.3d at 566.  However, the *Knutson* court only arrived at this finding after concluding that the plaintiff lacked notice of the arbitration agreement to begin with.  *Id.*  Importantly, the plaintiff had "purchased a Toyota Tacoma truck, which came with a 90-day trial subscription to Sirius XM satellite radio," not appreciating that he had "entered into an agreement for service with Sirius XM when he purchased the vehicle."  *Id.* at 562-66 ("A reasonable person in [plaintiff's] position could not be expected to understand that purchasing a vehicle from Toyota would simultaneously bind him or her to any contract with Sirius XM, let alone one that contained an arbitration provision without any notice of such terms.").  The court thus held that plaintiff's maintenance of his free trial subscription to Sirius XM's satellite radio service did not constitute

31

"unambiguous assent" because he "would only have had notice of his opportunity to cancel his subscription, or the effect of his continued use of the service," if he had opened and read the notice from Sirius XM, "which — in view of his lack of awareness of any contractual relationship with Sirius — he had no reason to do." *Id.* at 566.

The Court is similarly unpersuaded by Petitioners' invocation of *Schnabel* v. *Trilegiant Corp.* In *Schnabel*, the plaintiffs made various purchases on Priceline.com and Beckett.com. 697 F.3d at 114. In the course of making those purchases, the plaintiffs were presented with an enrollment offer for the defendant's discount program; just like in *Knutson*, the *Schnabel* plaintiffs claimed to be unaware that they were being offered a contract with the defendant at the time they made the purchases. *Id.* at 120. And just like in *Knutson*, the court found that the plaintiffs had not assented to the proposed arbitration agreement contained in the defendant's contract offer, even though the defendant had notified the plaintiffs of the offer's terms via email after their enrollment: "there was no prior relationship between the parties that would have suggested that [any] terms sent by email after the initial enrollment were to become part of [a] contract [between them]." *Id.* at 126 ("[T]hat someone has received an email does not without more establish that he or she should know that the terms disclosed in the email relate to a service in which he or she had previously enrolled and that a failure affirmatively to opt out of the service amounts to assent to those terms.").

Put simply, *Knutson* and *Schnabel* are cases about inadequate notice, not a categorical statement that maintaining a subscription without using it constitutes assent to a proposed contract of which the consumer has notice. And, in the case before the Court, there is no dispute that Petitioner Ortiz had notice of the December 2022 Terms. *See* Section B.2.b, *supra*. As such, the reasoning of those cases is not transferable to the one at hand.

Still, the Court cannot accept Respondent's argument that Ortiz assented to the December 2022 Terms even though "she did not engage with the HBO Max platform at all after the December 2022 Terms came into effect" and simply "let her already-existing subscription expire." (Pet. Opp. 14). For a court to infer assent, a user must "take some action." *In re Facebook Biometric Info.*, 185 F. Supp. 3d at 1166. On Respondent's own account of the facts, Ortiz neither logged into her account, nor streamed any content, nor clicked a button "accepting" the December 2022 Terms, nor made any payments to Respondent following her receipt of the NAM Email; that is, she took no action at all. For this reason, the Court finds that Respondent has not demonstrated that Ortiz is bound by the December 2022 Terms.

Nonetheless, the Court finds that, like Petitioners Brooks, Maldonado, and Walker, use of the HBO Max platform by Ortiz as an "authorized user" on an account other than her own after the December 2022 Terms came into effect could plausibly constitute acceptance of those terms. Thus, the Court will likewise order discovery as to whether Ortiz used Respondent's platform as an "authorized user" any time after the December 2022 Terms were posted.

33

### iii.        Assent Through Logging In

Respondent's third theory of unambiguous assent also pertains to a single Petitioner, Katharine Guzenski.  To review, Guzenski's subscription expired on May 27, 2022, but on June 22, 2023, Guzenski logged into her (inactive) account on the platform.  (Kelsay Decl. ¶¶ 17, 21-24).  Respondent alleges that, by logging in on June 22, 2023, Guzenski assented to the May 2023 Terms.  (Resp. Br. 5-6).  Respondent also alleges that, upon logging in, Guzenski would have encountered a page prompting her to click a button that said "Start Streaming," accompanied by a disclosure that "[b]y clicking 'Start Streaming,' you agree to the [May 2023 Terms]" (the "'Start Streaming' Notice").  (Kelsay Decl. ¶ 23).  To actually access the platform stream videos, Guzenski would have had to click the button in the "Start Streaming" Notice. (*Id.*).  Respondent asserts, but proffers no evidence, that Guzenski clicked the "Start Streaming" button.  (*Id.*).

The Court finds that merely logging onto HBO Max without clicking the "Start Streaming" button does not constitute unambiguous assent to the May 2023 Terms and the NAM Agreement therewith.  Logging in alone does not amount to "some action, such as clicking a button or checking a box, that unambiguously manifest[s] [one's] assent" to a website's terms of use.  *Berman*, 30 F.4th at 856.  That said, the Court finds that clicking the "Start Streaming" button *does* constitute unambiguous assent to the May 2023 Terms and the NAM Agreement therewith.  "A user's click of a button can be construed as an unambiguous manifestation of assent … [where] the user is explicitly advised

34

that the act of clicking will constitute assent to the terms and conditions of an agreement," *Berman*, 30 F.4th at 857; here, users were warned that "[b]y clicking 'Start Streaming,' you agree to the [May 2023 Terms]" (Kelsay Decl. ¶ 23). *See, e.g.*, *Oberstein* v. *Live Nation Ent., Inc.*, 60 F.4th 505, 515-16 (9th Cir. 2023) (finding an agreement was formed where website prompted a user to "click on the 'Place Order' button, directly above which [was] language stating: 'By continuing past this page and clicking 'Place Order', you agree to our Terms of Use'" and "[t]he 'Terms of Use' hyperlink [was] written in bright blue font, distinguishing it from the surrounding text"); *Lee* v. *DoNotPay, Inc.*, 683 F. Supp. 3d 1062, 1070 (C.D. Cal. 2023) (finding consumer received conspicuous notice of hyperlinked terms and conditions on a website where the hyperlink was "underlined and … clearly set apart from the surrounding text").

Therefore, whether Petitioner Guzenski is subject to the NAM Agreement is dependent upon whether she clicked the "Start Streaming" button after encountering the "Start Streaming" Notice during her June 2023 visit to the HBO Max platform. For this reason, the Court authorizes discovery to resolve this dispute of fact. Further, in the event that Guzenski did not click "Start Streaming," she, too, may have assented to the NAM Agreement by using the HBO Max platform as an "authorized user" on an account other than her own after the December 2022 Terms came into effect. Accordingly, the Court will authorize Respondent to seek discovery on the same.

### iv.    Effect of the Rejection Letters

As a final matter, the Court addresses Petitioners' argument that they did not assent to the NAM Agreement because they each sent letters to Respondent explicitly rejecting the proposed new terms within 30 days of receiving the NAM Emails.  (Pet. Opp. 16).[7]  To the extent discovery reveals that Petitioners did not assent to the NAM Agreement, the rejection letters that Petitioners sent to Respondent were needless; Petitioners were not bound by the NAM Agreement in any event.  To the extent discovery reveals that Petitioners did assent to the NAM Agreement, *e.g.*, by accessing the HBO Max platform after the December 2022 Terms came into effect as an authorized user on another individual's account, the rejection letters are also irrelevant.  The NAM Agreement was an open offer that Petitioners were free to accept at any time; Petitioners could not reject the December 2022 Terms via letter and then continue to use the HBO Max platform without those terms applying to them.  Accordingly, the rejection letters do not alter the Court's analysis herein.

---

[7]    The Court is unpersuaded by Respondent's arguments to the effect that the letters sent by Petitioners rejecting the December 2022 Terms ought to be discarded.  Respondent claims that, among the many letters sent by consumers represented by Petitioners' counsel, there were letters sent by people who "do not appear to be HBO Max subscribers at all." (Resp. Br. 12).  However, both sides agree that the claimants currently before the Court are former HBO Max subscribers.  (Pet. Br. 3; Resp. Br. 5-6).  Therefore, any deficiencies in letters sent on behalf of claimants not currently before the Court are irrelevant to the Court's determination of the instant dispute.  Additionally, the Court is unpersuaded by Respondent's attempt to raise vague concerns about a hypothetical conflict of interest between Petitioners and their counsel.  (Resp. Br. 16-17).  If Respondent believes it can demonstrate an improper conflict, it may raise its concerns more fully via a motion to disqualify.

### 3.     The NAM Agreement Is Enforceable

In addition to claiming that they did not assent to the NAM Agreement, Petitioners also claim that the NAM Agreement is, as a general matter, unenforceable.  Thus, in Petitioners' view, the Court should deny Respondent's cross-motion to compel arbitration irrespective of whether Petitioners assented to the NAM Agreement.  The Court discusses in turn Petitioners' arguments in support of their position that the NAM Agreement is invalid, finding each unavailing.

### a.     The NAM Agreement Was Supported by Consideration

Petitioners first argue that the NAM Agreement is invalid because no "incremental consideration supported its formation."  (Pet. Opp. 15-16).  That consideration is required to form a contract is, of course, a bedrock principle of contract law.  In the same way, when an existing agreement is modified, there must be consideration to support the addition of any terms to that agreement: "[t]here can be no doubt that an agreement adding to the terms of existing agreement between the same parties, and by which new and onerous terms are imposed upon one of the parties without any compensating advantage, requires a consideration to support it."  *Louisville Title Ins. Co.* v. *Sur. Title & Guar. Co.*, 60 Cal. App. 3d 781, 791 (Cal. Ct. App. 1976) (alterations adopted).

Here, the Court finds that the NAM Agreement was supported by consideration.  As Respondent points out, in agreeing to the December 2022 Terms, "both parties obtained new dispute resolution rights."  (Resp. Reply 3 n.6).  *See, e.g., Garner* v. *Inter-State Oil Co.*, 52 Cal. App. 5th 619, 625 (Cal. Ct.

37

App. 2020) (finding that "the parties made mutual, obligating promises to arbitrate" and therefore their agreement was supported by consideration).  This "promise to be bound by the arbitration process" alone "serves as adequate consideration."  *Cir. City Stores, Inc.* v. *Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002).

### b.     The NAM Agreement Is Not Unconscionable

As a second effort to persuade the Court that the NAM Agreement is unenforceable, Petitioners argue that its terms are unconscionable.  (Pet. Opp. 20-25).  Under California law, "[a] contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." *OTO, L.L.C.* v. *Kho*, 8 Cal. 5th 111, 125 (2019).  To be deemed unenforceable, a court must find that the contract is both procedurally and substantively unconscionable.  *See Heckman* v. *Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 952 (C.D. Cal. 2023).  What is more, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz* v. *Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).

### i.     Procedural Unconscionability

Petitioners argue that the NAM Agreement is procedurally unconscionable in two ways.  *First*, Petitioners claim that the NAM Agreement is procedurally unconscionable as a so-called "contract of adhesion," that is, a contract that Respondent provided Petitioners no opportunity to negotiate.

38

(Pet. Opp. 21-22).  *Second*, Petitioners argue that the NAM Agreement is unconscionable because its terms purport to apply to claims that had already accrued by the time it went into effect.  (*Id.* at 22).  The Court considers each argument in turn.

As to Petitioners' first argument, the Court finds that the NAM Agreement is enforceable, despite its status as a "contract of adhesion."  Under California law, contracts of adhesion are not automatically unenforceable simply because they are not negotiated.  *See, e.g., Carnival Cruise Lines, Inc.* v. *Shute*, 499 U.S. 585, 593-95 (1991) (finding contract provision on back of cruise ticket, which was not negotiated by parties, enforceable).  Instead, "contracts of adhesion are generally enforceable according to their terms, [but] a provision contained in such a contract cannot be enforced if it does not fall within the reasonable expectations of the weaker [] party."  *Fischer* v. *First Int'l Bank*, 109 Cal. App. 4th 1433, 1446 (Cal. Ct. App. 2003).

Here, the Court believes that the requirement to arbitrate before the NAM in the NAM Agreement "[would] fall within the reasonable expectation of [Petitioners]."  *Fischer*, 109 Cal. App. 4th at 1446.  Importantly, the NAM arbitration provision "w[as] not hidden" from Petitioners; it was in the body of the December 2022 Terms and "w[as] in a normal font."  *Soltani* v. *W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043 (9th Cir. 2001) (enforcing contract of adhesion that prohibited employees from suing their employer more than six months after the end of their employment).  Indeed, Petitioners do not dispute that they received reasonably conspicuous notice of the NAM Agreement in the form of

39

the NAM Email.  (Pet. Opp. 10).  For this reason, the NAM Agreement's status as part of a contract of adhesion does not automatically make it unconscionable.

The Court finds Petitioners' second argument on procedural unconscionability to be more persuasive, albeit still unconvincing.  Specifically, Petitioners argue that the fact that the NAM Agreement applies to claims that had already accrued by the time it went into effect renders the agreement procedurally unconscionable.  (Pet. Opp. 22).  California courts have traditionally frowned upon modifications of arbitration clauses that apply to claims that have already accrued or are known to the offeror.  *See, e.g., Peng* v. *First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (Cal. Ct. App. 2013) (finding that an implied covenant of good faith and fair dealing "prevents [a party] from modifying an arbitration agreement once a claim has accrued or become known to it"); *Peleg* v. *Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1433 (Cal. Ct. App. 2012) ("[A]n arbitration contract containing a modification provision is illusory … [if] a contract change [] applies to claims that have accrued or are known.").

The Court does not agree that the NAM Agreement's retrospective application renders it unconscionable, however.  The cases Petitioners cite in support of their position each deal with arbitration agreements in employment contracts, not consumer contracts.  *See, e.g., Peleg*, 204 Cal. App. 4th at 1433 (finding arbitration agreement between employer and employee to be illusory because employer retained unilateral right to modify the contract and any

40

modifications would apply to claims that had already accrued at time of modification).  In the context of consumer contracts, on the other hand, courts have permitted this kind of retroactivity.  *See Trudeau* v. *Google LLC*, 816 F. App'x 68, 70 (9th Cir. 2020) (unpublished decision) (enforcing consumer arbitration agreement that covered claims that had already accrued at the time agreement went into effect because agreement was "adopted by bilateral agreement between [plaintiff] and [defendant]; [defendant] gave [plaintiff] notice of the new terms and he affirmatively accepted them").  Accordingly, the Court finds that the NAM Agreement is not procedurally unconscionable.[8]

### ii.    Substantive Unconscionability

Petitioners also allege that the NAM Agreement's terms are substantively unconscionable because they are "overly harsh" and "one-sided."  *MacClelland* v. *Cellco P'ship*, 609 F. Supp. 3d 1024, 1034 (N.D. Cal. 2022) (citing *Little* v. *Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003)).  Petitioners argue in particular that the NAM Agreement's terms are substantively unconscionable for primarily two reasons:

> (i)    The NAM Agreement's arbitration staging procedure creates undue delays in consumers' ability to bring claims and, more generally, lacks mutuality because it gives Respondent an unfair advantage in the arbitration process.  (Pet. Opp. 23-24).

---

[8]    Respondent's argument that such a backwards-looking modification of an arbitration agreement is not procedurally unconscionable under New York law is irrelevant.  (Resp. Reply 5-6).  As discussed above, California law determines the "the validity, revocability, and *enforceability*" of this agreement to arbitrate.  *Chelsea Square Textiles, Inc.* v. *Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 295 (2d Cir. 1999) (emphasis added).

> (ii)    The NAM Agreement illegally allows for shifting the costs of arbitration to the consumer if the consumer loses in arbitration.  (Pet. Opp. at 24).

The Court addresses each of these arguments in turn, finding that neither of them supports a finding of substantive unconscionability.

As to the NAM Agreement's arbitration staging procedure, Petitioners' argument relies upon an analogy to the aforementioned *MacClelland* case, where the court found a mass arbitration procedure substantively unconscionable.  609 F. Supp. 3d at 1042.  In that case, the mass arbitration procedure at issue was plagued by delays.  *Id.*  Moreover, the respondent, Verizon, refused to toll consumers' claims pending arbitration, essentially guaranteeing that many consumers would be unable to have their claims heard.  *Id.*  While the *MacClelland* court did express concern that "[r]equiring [] consumers … to wait months, more likely years[,] before they can even submit a demand for arbitration [wa]s 'unreasonably favorable' to Verizon," its finding of unconscionability was keyed to the fact that the arbitration provision at issue was "pregnant with the risk that claims [would] be effectively barred when coupled with the statute of limitations."  *Id.*  Additionally, the arbitration agreement in *MacClelland* prohibited claimants from opting out of arbitration, regardless of how many stages of arbitrations a claimant had to wait through.  *Id.* at 1043.

The arbitration procedure set forth in the NAM Agreement is a far cry from that of *MacClelland.*  For instance, the NAM Agreement's arbitration procedure allows fifty claims to proceed in the first round, one hundred claims

to proceed in the second round, and two hundred claims to proceed in the

third round, meaning many more arbitrations would occur in a much quicker

timeframe than pursuant to the operative procedure in *MacClelland*.  *Compare*

Dec. 2022 TOU at 42-43, *and* May 2023 TOU at 33-35, *with MacClelland*, 609

F. Supp. 3d at 1040 (noting that only ten claims could be arbitrated in each

stage of arbitration and that this process would require 156 years to arbitrate

the cases of all plaintiffs).  The NAM Agreement thus presents less risk that the

resolution of claims will be unduly delayed.  And while the *MacClelland* court

was concerned that delays could lead to some plaintiffs' claims becoming time-

barred, there is no such risk here, as the NAM Agreement tolls the applicable

statute of limitations as soon as a consumer files a NOD.  *Compare* Dec. 2022

TOU at 35, *and* May 2023 TOU at 33, *with MacClelland*, 609 F. Supp. 3d at

1042.  For these reasons, the Court does not find that the mass arbitration

provisions of the NAM Agreement are substantively unconscionable.

Additionally, the Court rejects Petitioners' argument that the NAM

Agreement is substantively unconscionable in that it illegally "allows

[Respondent] to shift all the costs of arbitration to a consumer if the consumer

loses in arbitration."  (Pet. Opp. 24).  To the contrary, the NAM Agreement

requires consumers to bear costs only if "the arbitrator awards sanctions or

finds that either the substance of the claim, the defense, or the relief sought is

frivolous or brought for an improper purpose."  (Dec. 2022 TOU at 38; May

2023 TOU at 31).  Additionally, the NAM Agreement provides that the arbitrator

may only "award[]... attorneys' fees and costs in accordance with applicable

law," a provision that mirrors that found in the AAA rules that Petitioners themselves seek to enforce.  (Dec. 2022 TOU at 38; May 2023 TOU at 31).  *See* AAA, *Consumer Rules*, R-44(c) at 28 (noting that arbitrator may allocate fees to party upon determination that its claim was frivolous).

Accordingly, on the factual record currently before it, the Court does not find that the NAM Agreement is substantively unconscionable.  Further, because the Court previously determined that the NAM Agreement is not procedurally unconscionable, and because a finding of unenforceability requires both procedural unconscionability and substantive unconscionability, the Court concludes that the NAM Agreement is not unenforceable on the basis of unconscionability.[9]

### 4. Both the NAM and AAA Agreements Cover the Claims at Issue

In the foregoing analysis, the Court established that all Petitioners are subject to one of two arbitration provisions.  That is, the Court established that Petitioners assented to arbitrating their disputes with Respondent before the AAA pursuant to the AAA Agreement when they created an account on HBO Max.  (*See* Brooks Decl. ¶ 5; Guzenski Decl. ¶ 5; Maldonado Decl. ¶ 5; Ortiz Decl. ¶ 5; Walker Decl. ¶ 5).  Further, evaluating the evidence currently before the Court, the Court found that:

---

[9]     Petitioners also take issue with the NAM Agreement's requirement that consumers prepare and sign a detailed notice of dispute "with information that … [Respondent] has demonstrated is within its possession."  (Pet. Opp. 24).  The Court does not find that this requirement is so "onerous or beyond the reasonable expectation of the user" as to amount to substantive unconscionability.  *Bielski* v. *Coinbase, Inc.*, 87 F.4th 1003, 1014 (9th Cir. 2023).

- Petitioners Brooks, Maldonado, Guzenski, Ortiz, and Walker may have assented to the NAM Agreement if they used the HBO Max platform as authorized user on someone else's account, see *supra* Section B.2.i-ii;

- Petitioner Guzenski may have assented to the NAM Agreement if she clicked the "Start Streaming" button when she logged onto the platform in June 2023, see *supra* Section B.2.iii.

The Court's analysis on the parties' cross-motions to compel arbitration does not end there, however. After all, in addition to determining "whether the parties agreed to arbitrate," a court ruling on a motion to compel arbitration must also determine "whether the scope of that agreement encompasses the claims at issue." *Holick*, 802 F.3d at 394. Accordingly, the Court turns to the issue of whether the NAM and AAA Agreements (regardless of which one Petitioners are subject to) encompass the claims at issue.

"The FAA was enacted to reverse 'centuries of judicial hostility to arbitration agreements' and 'to place arbitration agreements upon the same footing as other contracts.'" *Crewe*, 884 F. Supp. 2d at 72 (quoting *Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 510-11 (1974)). Where, as here, an arbitration agreement is found to exist, "the FAA creates a presumption of arbitrability, meaning that doubts as to its scope — whether the agreement encompasses the claims at issue — 'should be resolved in favor of coverage.'" *Id.* (quoting *Paramedics Electromedicina Comercial, Ltd.* v. *GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004)).

In this case, there can be no doubt that the AAA Agreement and the NAM Agreement cover Petitioners' respective disputes. Both agreements purport to

45

cover "all disputes and claims between [consumers and Respondent], except for claims arising from bodily injury or that pertain to enforcing, protecting, or the validity of your or our intellectual property rights."  (Apr. 2020 TOU at 34; Oct. 2021 TOU at 44; Nov. 2022 TOU at 32-33; Dec. 2022 TOU at 32; May 2023 TOU at 27).  Petitioners bring claims against Respondent for violations of the VPPA, and specifically, for "sharing each Petitioner's private video-watching history on HBO Max with third-parties like Meta." (Pet. Opp. 4).  These claims clearly fall under the broad umbrella of "disputes and claims between [consumers and Respondent]"; moreover, they do not arise from bodily injury or pertain to intellectual property rights.  Accordingly, the Court finds that Petitioners' claims are covered by whichever arbitration agreement applies to each Petitioner.

### 5. Petitioners' Request for Sanctions Is Dismissed Without Prejudice to Its Renewal

Finally, Petitioners request sanctions under Cal. Civ. Proc. § 1281.97 in the amount of reasonable attorneys' fees and costs related to arbitration. Petitioners claim they are entitled to these sanctions because Respondent materially breached and is in default of the AAA Agreement.  As the Court has not ruled on the enforceability of either the AAA or NAM Agreements as between Respondent and Petitioners, it defers any ruling on Petitioners' request for sanctions.  Accordingly, the Court will dismiss Petitioners' request for sanctions without prejudice to renew.

46

**CONCLUSION**

The Court orders limited, targeted discovery into Petitioners' assent *vel non* to the NAM Agreement in accordance with the analysis set forth in this Opinion.  The parties shall complete this discovery within 60 days of the date of this Opinion, and each side shall submit a supplemental memorandum of law of no more than fifteen pages interpreting their findings in view of the Court's analysis herein **on or before September 6, 2024**.

SO ORDERED.

Dated:      July 8, 2024
            New York, New York

_____
          KATHERINE POLK FAILLA
          United States District Judge

47